UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

******************************

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal No. 09-CR-507 (DNH) |
| v. | RESPONSE TO DEFENDANTS' RULE 29 |
| BALDEO SAHABIR and KAMLA SAHABIR, | AND RULE 33 MOTIONS |
| Defendants. | |

******************************

## REPLY TO DEFENDANT'S RULE 29 AND RULE 33 MOTIONS

1. **INTRODUCTION**

Defendants move this Court, pursuant to Rule 29 of the Federal Rules of Criminal Procedure, for a judgment of acquittal on the grounds that the evidence produced at trial was insufficient to establish the defendants' guilt beyond a reasonable doubt. Alternatively, defendants move pursuant to Rule 33 for a new trial on the grounds that the government's failure to disclose evidence prior to trial deprived defendant of due process of law. *See Brady v. Maryland*, 373 U.S. 83 (1963). For the reasons that follow, both of these contentions are meritless and both defendants' Rule 29 and Rule 33 motions should be DENIED.

2. **SUFFICIENCY OF THE EVIDENCE**

Defendants argue that the government presented insufficient evidence at trial to prove beyond a reasonable doubt that they were knowing participants in the bank fraud and money laundering

conspiracies. "A defendant challenging the sufficiency of the evidence bears a heavy burden." *United States v. Pipola*, 83 F.3d 556, 564 (2d Cir. 1996) (*citing Glasser v. United States*, 315 U.S. 60, 80 (1942)). On a sufficiency challenge, the court "views the evidence in the light most favorable to the government, drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility." *United States v. Arena*, 180 F.3d 380, 391 (2d Cir. 1999) (internal quotation marks omitted). The court will sustain the jury's verdict so long as "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

 A. Baldeo Sahabir

The evidence at trial demonstrating Baldeo Sahabir's guilt of conspiracy to commit money laundering, money laundering and aiding and abetting the commission of bank fraud was as follows: Lal Singh testified that beginning in 1996, he worked as the Vice President of the Redemption Department at the Bank of New York. In his capacity as VP, Singh had access to millions of dollars in unclaimed funds that ultimately would be escheated to the State of New York. Singh had no legal entitlement to those funds. Singh testified that in December of 2000, he met with both Baldeo Sahabir and Baldeo Sahabir's wife, Kamla Sahabir. At that meeting, Baldeo Sahabir provided Singh with a piece of paper that had Baldeo Sahabir's bank account information written on it. Singh and the Sahabirs determined that Singh would wire money from the redemption accounts at the Bank of New York where Singh was employed to the bank account for which Baldeo Sahabir had given Singh the information. The Sahabirs would split the proceeds of this bank fraud 50/50, with the Sahabirs returning half of the wired funds to Singh.

Singh testified that he advised Baldeo that the monies were not legally obtained from the Bank of New York. Singh testified that over the next three years, he wired money to Baldeo Sahabir's bank account dozens of times. Baldeo Sahabir would give Lal Singh his cut of the proceeds by driving to meet Singh in various locations in Queens, NewYork. Kamla Sahabir would often be present at these meetings.

The testimony of John Deeb, a forensic accountant, and the records of Baldeo Sahabir's bank account corroborated Singh's testimony. Between December 13, 2000 and April 2, 2003, Lal Singh sent 66 wire transfers totaling $521,918.19 to Baldeo Sahabir's bank account at JP Morgan Chase. Deeb's analysis of that account demonstrated that Baldeo Sahabir wrote 56 checks from that account either to cash with "Lal Singh" written in the memo line or blank checks later filled in by Singh or his associates. These checks totaled $347,000.00. Deeb testified that 84% of the money going into Baldeo Sahabir's account came from wire transfers from Singh. Baldeo's explanation for this account activity during his testimony at trial was that he had received a small loan from Singh, a condition of which was that Singh be allowed access to Baldeo Sahabir's account. This explanation of the account activity was simply implausible.

John Deeb testified that in April of 2003, JP Morgan Chase closed Baldeo Sahabir's bank account because of the suspicious account activity. Singh confirmed this assertion in his testimony that Baldeo Sahabir and Kamla Sahabir informed him in April of 2003 that he could no longer wire money into Baldeo Sahabir's account. Singh testified that in July of 2003, the Sahabirs met with Singh again, and handed him a piece of paper with new bank account information on it. This account was in the name of America Seva International, an account on which both Baldeo and Kamla Sahabir had signatory authority. Over the next four years, beginning in July of 2003 until May of

2007, Singh sent 282 wire transfers to the America Seva account, totaling $2.4 million. From that account, checks totaling $1,048,000.00 were made out to cash and ultimately given to Singh. Most of these checks were signed by Baldeo Sahabir, although several were signed by Kamla Sahabir. Deeb testified that 92% of the money going into the America Seva account came from the illegal transfers from Lal Singh.

Singh testified that he received his split of the proceeds in the same way that he had gotten the money from Baldeo Sahabir's JP Morgan Chase account. During the time period that the Sahabirs were using the America Seva account to receive money from Singh, the Sahabirs lived in Schenectady, New York. Both Singh and Baldeo testified that Baldeo Sahabir would drive several times per month from Schenectady to Queens to give Singh his cut of the money. Baldeo testified that this trip would take approximately 6-8 hours round trip. During cross-examination, Baldeo Sahabir contended that he was intimidated by Singh, and that was the reason that he drove 8 hours several times a month to give Singh his split of the money, rather than mailing or wiring it to Singh. Such an improbable explanation was rightfully rejected by the jury.

The jury had reason to question Baldeo Sahabir's credibility. During his testimony, for example, Baldeo Sahabir contended that he had no discernible role in the America Seva organization. Documentary evidence, including America Seva incorporation documents for America Seva and bank records from the America Seva account, however, both showed Baldeo listed as an officer of the organization.

At no point did Baldeo Sahabir dispute the authenticity of his signature on the dozens and dozens of checks drawn on the two accounts. During his testimony, Baldeo contended that he had never kept a dime of any of the money wired into his account. John Deeb testified that his analysis

of the accounts showed cash withdrawals and checks made out to cash totaling approximately $1.4 million. Unlike the checks to cash Singh received, none of the checks to cash factoring into Deeb's assessment of the $1.4 million figure had any mention of Lal Singh in the memo lines. Those cash withdrawals were traceable only to the Sahabirs. In fact, Deeb testified that the monies traceable to Singh or his associates constituted 46% of the embezzled funds funneled through the Sahabir accounts. This corroborated Singh's testimony that his arrangement with the Sahabirs was to split the proceeds 50/50.

Further, the government admitted evidence regarding the serious deficiencies in record-keeping by the Sahabirs. Neither of the Sahabirs ever declared any of the income from the Lal Singh wire transfers on any tax documents. Indeed, from 2000-2003, the Sahabirs declared a total of $147,010.00 on their joint tax return. The evidence showed that during that same time period, Lal Singh had wired $521,918.19 to Baldeo Sahabir's checking account. From 2004-2007, the Sahabirs declared on their joint return a total of $197,634.00 in income. During that same time period, the Sahabirs received $2.4 million in wire transfers from Lal Singh. This failure is persuasive circumstantial evidence were aware that the Sahabirs knew that the undeclared money was criminal proceeds. Additionally, in response to a subpoena for America Seva records, neither of the Sahabirs produced a single document reflecting the wire transfers from Lal Singh into the America Seva account. This failure of record-keeping, the government argued, was also evidence that the Sahabirs had attempted to conceal the fact that the organization they ran was receiving this money because they knew they were engaged in a criminal enterprise.

In short, the evidence against Baldeo Sahabir was overwhelming, and there is no basis before this Court to grant his motion pursuant to Rule 29 or Rule 33.

B.     Kamla Sahabir

Much of the evidence that established the guilt of Baldeo Sahabir also established the guilt of his wife, Kamla.  Kamla had signatory authority on the America Seva account, and indeed, made out checks designated to Lal Singh in the memo line that were drawn on that account.  All of the analysis of the accounts pertains equally to Kamla - the fact that 92% of the assets in the America Seva account (an organization of which Kamla was the head) came from Lal Singh, the fact that over $1.2 million was withdrawn from the Seva account in cash and the fact that both Kamla and Baldeo had signatory authority on the America Seva account and both drew checks given to Lal Singh from that account.  The testimony of Lal Singh concerning his meetings with the Sahabirs was also equally relevant to Kamla's guilt, as Singh testified that Kamla was present at the meetings in December of 2000 and July of 2003 when the Sahabirs gave Lal Singh account information.

Kamla Sahabir now argues that she was in the same position regarding Lal Singh as four of the government witnesses who testified.  These four witnesses, friends and family of Lal Singh, testified that Singh had given them blank checks, drawn on the America Seva account, and asked them to cash the checks and give him the money.  Singh testified that he had done so with the intent of keeping his name off of the blank checks given to him by Baldeo and Kamla.  This ignores the fact that the difference between these four family members and friends and the defendants was that none of those four people kept any of the money given to them by Singh.  By contrast, the Sahabirs walked away with a little over half of the money wired by Singh.

The crux of Kamla Sahabir's Rule 29 and Rule 33 motions is that the jury verdict finding her guilty on the bank fraud counts relating to the America Seva account, but not Baldeo Sahabir's JP Morgan Chase account, is somehow an inconsistent finding. Such is not the case. A likely explanation is that Kamla did not have signatory authority on Baldeo's account but did have such authority on the America Seva account. No checks drawn on Baldeo's account were signed by Kamla. However, several checks drawn on the America Seva account bore Kamla's signature.

The verdict on the money laundering and the underlying conspiracy counts did not require a finding by the jury that Kamla Sahabir had been involved in the conspiracy beginning in 1996, or even in 2000 when Baldeo Sahabir's account was used for the wire transfers. A person can join a conspiracy at any time during its existence and thereby become a member of the conspiracy. *United States v. Guillette*, 547 F.2d 743, 751 (2d Cir. 1976). The jury's finding of guilt on the bank fraud charges connected to the America Seva account, an organization of which Kamla Sahabir was the leader, indicates that the jury did believe that Kamla had used the America Seva account as a funnel for criminal proceeds. There is no fundamental inconsistency in the jury's finding, and certainly not one sufficiently indicative of a "manifest injustice" to merit a judgment of acquittal or a new trial. If anything, the jury's verdict reflects that it considered the evidence very carefully, rejecting some of the government's evidence, but finding some of it credible. Such is not a verdict justifying reversal.

3.  **DISCLOSURE OF IMPEACHMENT EVIDENCE**

Defendants allege that the government contravened the disclosure principles from *Brady v. Maryland* when it failed to turn over, prior to trial, a memorandum of interview generated in connection with the investigation of this case that supposedly contradicted the testimony of co-

7

conspirator Lal Singh, a principal witness for the government. The memorandum of interview concerned an interview done by secret service agents with Karen Alli and her brother, Paul. The memo reflected the fact that Karen Alli was a deaf mute who had difficulty communicating and required intensive care by family members. Further, neither Karen nor Paul had ever heard of Lal Singh, Kamla Sahabir or Baldeo Sahabir. Paul Alli indicated that his father, Abdel, had a serious gambling problem and was frequently in debt because of outstanding horse-race losses.

At trial, the government subpoenaed Karen and Paul Alli to be witnesses at trial. Travel arrangements for them were in place. Because of the development of the evidence at trial, the government decided that it was unnecessary to call Karen or Paul Alli as government witnesses, but indicated to both defendants' counsel that it would produce both witnesses under subpoena and provide for their travel and hotel arrangements if the defense wished to examine them. The defendants jointly proposed to admit the memorandum of interview in place of the Allis' testimony. The government agreed to this procedure. The memorandum was read into the record before the jury, and both defendants referred to the substance of the memorandum extensively during closing argument.

During both his direct and cross-examination, Lal Singh testified that he had a gambling problem and that his preferred form of gambling was horse-racing. Defendants now argue that the Alli memorandum was *Brady/Gilgio* material because the memorandum provides support for the argument that Lal Singh in fact perpetrated the prior fraud with Karen Alli's father, a gambler. The defendants contend that this evidence tends to indicate that Singh had orchestrated a previous conspiracy, thus demonstrating that he may have used the Sahabirs as dupes in carrying out the subsequent frauds. Defendants allege that earlier disclosure of this document would have allowed

8

them to impeach Singh's credibility, and to argue more effectively that Singh was "making the Sahabir's [sic] the 'fall guys' for someone else's complicity with him." Kamla Sahabir's Motion at 6. For the reasons that follow, defendants' *Brady* claim must fail, because the evidence at issue was immaterial to the outcome of the trial.

Under *Brady v. Maryland* and its progeny, the prosecution has an affirmative duty to disclose evidence that is favorable to an accused where such evidence is material to either guilt or punishment. *Brady v. Maryland*, 373 U.S. 83 (1963); *Strickler v. Greene*, 527 U.S. 263, 280 (1999). To establish a *Brady* violation, a defendant must prove three elements: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the prosecution, either willfully or inadvertently; and (3) the evidence must have been material to the outcome of the case. *Strickler*, 527 U.S. at 281-82; *United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001).

Evidence is material only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *United States v. Bagley*, 473 U.S. 669, 682 (1985). A "reasonable probability" is a probability "sufficient to undermine confidence in the outcome." *Id*.; *see also United States v. Spinelli*, 551 F.3d 159, 164-65 (2d Cir. 2008) (finding "undisclosed information is deemed material so as to justify a retrial only if there is a reasonable probability that, had it been disclosed to the defense, the result of the proceeding would have been different). This materiality standard is not a "question of whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict that is worthy of confidence." *Kyles*, 514 U.S. at 434.

9

The *Brady* disclosure requirement encompasses evidence that could have been used to impeach a witness. *Bagley*, 473 at 676; *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998); *United States v. Payne*, 63 F.3d 1200, 1210 (2d Cir. 1995); *Giglio v. United States*, 405 U.S. 150 (1972). In general, impeachment evidence has been found to be material "where the witness supplied the only evidence linking the defendants to the crime . . . or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case." *Payne*, 63 F.3d at 1210. Conversely, impeachment evidence is not material if the testimony of the witness was corroborated by independent evidence of guilt, or when the suppressed evidence "merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." *Id.* at 1210. Undisclosed impeachment evidence is not material under *Brady* when, although "possibly useful to the defense, it is not likely to have changed the verdict." *Avellino*, 136 F.3d at 257.

Here, none of the three *Brady* prongs are met. First, Karen Alli's memorandum of interview was favorable to the accused only insofar as she stated she did not know Baldeo or Kamla Sahabir. Any further exculpatory value is speculative at best. It is argued that the memorandum's mention of the fact that Karen Alli's father was a gambler could have indicated that Karen Alli's father was associated with Lal Singh, who was a gambler. This construction of the evidence would have been speculative and was not supported by any other evidence put forth at trial.

Second, the government did not suppress the evidence in question. " . . . [E]vidence is not considered to have been suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney ''either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence.'' *United States v. Zackson*, 6 F.3d 911, 918 (2d Cir.1993) (quoting *United States*

10

*v. LeRoy*, 687 F.2d 610, 618 (2d Cir.1982), *cert. denied*, 459 U.S. 1174 (1983))." *Payne*, 63 F.3d at 1208 (2d Cir. 1995). Here, although the defendants were not provided with the memorandum prior to trial, they each had sufficient opportunity to take advantage of the evidence at trial. The evidence was provided to the defense before the close of the government's case and the defendants were able to read the memorandum into the record. The defendants now contend that they were unable to use the information as impeachment material in the cross-examination of Lal Singh. However, the defendants could have recalled Singh and cross-examined him using the Alli memorandum. The defendants chose not to take that step. Rather, *they proposed* an alternative procedure to admit the memorandum in evidence. The defendants each devoted substantial time during summation to the Karen Alli memorandum, and were able to argue to the jury that they believed it impeached the credibility of Lal Singh. Not only were the defendants given the opportunity to "take advantage of [that] evidence," they *did* take advantage of the evidence.

Third, the defendants have failed to establish a *Brady* violation because the evidence is insufficiently material to undermine confidence in the verdict. None of the offenses involving Karen Alli or her account were charged in the indictment. The relationship between Kamla Sahabir, Baldeo Sahabir, Lal Singh and Karen Alli was not a "critical element of the prosecution's case" upon which defendants' guilt depended. The jury could well have completely disregarded any evidence concerning Karen Alli and still sustained a verdict of guilty against the defendants. Further, unlike in *Payne*, in which the Second Circuit noted that impeachment evidence may be "material" if the witness supplied the only evidence linking the defendants to the crime, the defendants' guilt was supported by ample evidence apart from Singh's testimony. As discussed above, substantial documentary evidence connected the Sahabirs to the charged offenses. The bank records

11

demonstrated that the Sahabirs had received hundreds of wire transfers from Lal Singh, and had withdrawn in cash a little over 50% of the money wired by Singh. The Sahabirs' failure to declare any of the money on their taxes, and their failure to record any of the wire transfers in records kept by America Seva, all indicated the defendants' guilt. Further, the government's impeachment of Baldeo Sahabir's testimony that he had no real role in the America Seva organization and that he took lengthy, difficult car trips to give Lal Singh his cut of the proceeds purely because he owed Singh money provided evidence of the Sahabirs' complicity in the scheme.

Likewise, Singh's credibility was already shown to be questionable through the extensive cross-examination occasioned by his cooperator status. Indeed, as argued above, the jury may have found Singh's credibility to be impeachable, as reflected in the verdict acquitting Kamla Sahabir of the bank fraud counts involving Baldeo Sahabir's account because the primary evidence connecting Kamla Sahabir to those counts was the testimony of Lal Singh.

In light of the independent evidence of defendants' guilt, the already effective impeachment of Singh by both defendants based on Singh's cooperator status, and the Alli memorandum's lack of direct relevance to the defendant's guilt or innocence, the government's disclosure during trial of this impeachment evidence did not deprive defendants of due process sufficient to justify a new trial.

## CONCLUSION

The evidence against the defendants was more than sufficient, as a matter of law, to support a judgment of guilt on the charged offenses. The defendants have not provided this Court with any credible basis for granting a judgment of acquittal or for vacating the judgment and granting a new trial. The government did not violate its obligations under *Brady v. Maryland* or *Giglio v. United States* because the Alli memorandum does not qualify as impeachment material, the government did

Case 1:09-cr-00507-DNH   Document 101   Filed 09/29/10   Page 13 of 14

not suppress the Alli memorandum, and it was not material to the determination of guilt or innocence.  Further, the defendants effectively and thoroughly impeached the credibility of government witness Lal Singh.  The defendants' motions should therefore be denied.

                                                RICHARD S. HARTUNIAN
                                                United States Attorney

                                                s/Gwendolyn E. Carroll

                                By:    Gwendolyn E. Carroll
                                                Assistant U.S. Attorney
                                                Bar Roll No. 515777

Dated: September 29, 2010

13

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

*************************************
UNITED STATES OF AMERICA,

                                                                Criminal Action No.
      v.                                                   09-CR-507

BALDEO SAHABIR and
KAMLA SAHABIR,

                Defendants.
*************************************

CERTIFICATE OF SERVICE

I hereby certify that on September 29, 2010, I electronically filed the **GOVERNMENT'S RESPONSE TO DEFENDANT'S RULE 29 AND RULE 33 MOTIONS** with the Clerk of the District Court using the CM/ECF system, which sent copies to the following CM/ECF participants:

Stephen Coffey, Esq.

E. Stewart Jones, Jr., Esq

                                                                        /s/

                                                           Lori A. Geer